UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: NEVSUN RESOURCES LTD.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sept. 27, 2013

**ORDER**

12 Civ. 1845 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a consolidated putative class action brought on behalf of purchasers of Defendant Nevsun Resources Ltd.'s common stock between March 31, 2011 and February 6, 2012 (the "Class Period"). According to the Consolidated Class Action Complaint ("Complaint"), Nevsun and its senior management issued materially false and misleading statements concerning operations at Bisha Mine ("Bisha"), in which Nevsun holds a controlling interest. The Complaint alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. Defendants have moved to dismiss, arguing that the challenged statements are non-actionable forward-looking statements and that Plaintiffs have not pled facts supporting a strong inference of scienter. For the reasons stated below, Defendants' motion to dismiss will be denied.

## BACKGROUND

Nevsun is a "natural resource" company based in Vancouver, British Columbia. (Cmplt. ¶¶ 18, 22) Its common shares are traded on both the New York Stock Exchange Amex and the Toronto Stock Exchange. (Id. ¶ 18) Nevsun's only revenue-producing property is the Bisha Mine, a gold and base metal (copper and zinc) mine in Eritrea. (Id. ¶¶ 2, 24)

On February 7, 2012, Nevsun issued a press release announcing that (1) it had overstated gold ore reserves at the Bisha Mine by 30-35%, (or approximately 1.2 million tons);

and (2) 2012 gold production at Bisha Mine would be "about half of what Nevsun was previously expecting." (Cmplt. ¶¶ 4, 14, 92-93)  Nevsun blamed a "resource estimate used for mine planning" for the overstatement.  (Id. ¶ 93)   The value of Nevsun's stock dropped nearly 31% in one day, wiping out approximately $388 million in market capitalization.  (Id. ¶¶ 96, 166)

Plaintiffs allege that Nevsun; its President and Chief Executive Officer, Cliff F. Davis; its Chief Financial Officer, Peter Hardie; and its Vice President of Business Development and Investor Relations, Scott Trebilcock, violated the Securities Exchange Act through a series of false statements and omissions of material fact about the gold reserves at Bisha. (Id. ¶¶ 27, 31, 34)  The alleged Class Period begins on March 28, 2011 – when Defendants issued what Plaintiffs assert is a misleading press release concerning gold ore reserves at Bisha – and ends on February 6, 2012 the day before the announcement concerning Bisha's reduced gold production. (Cmplt. ¶¶ 4, 14, 93, 107, 183)

The Complaint alleges that Defendants false statements of material fact and omissions of material fact include the following:

(a) Nevsun's reported gold ore reserves were materially overstated by approximately 1.2 to 1.3 million tons, or by 35%, an overstatement of approximately 190,000 to 230,000 ounces of gold, (representing lost sales of approximately $303 to $368 million based on the price of gold per ounce as reported by Nevsun as of June 30, 2012 ($1,599 per ounce));

(b) Defendants failed to disclose that they caused Nevsun to progress through Bisha's Oxide zone materially faster than reported because Defendants encountered pockets of worthless waste rock instead of gold ore, as reflected in an ever increasing Strip Ratio, indicating that Bisha's gold ore reserves would be exhausted sooner than Defendants reported;

(c) Defendants failed to disclose that Bisha's three most senior executives left Nevsun/Bisha Mining Share Company;

(d) Defendants failed to disclose that the Company's <u>Oxide</u> reserve model was materially defective, as evidenced by routine reconciliation reports, actual production at the Bisha Mine and mining statistics that showed the gold ore mined in the <u>Oxide</u> zone at Bisha was materially less than the gold ore reserves Defendants reported to investors. Indeed, Defendants knew that Nevsun's resource <u>Oxide</u> reserve model was so deficient that in the Fall 2011, Defendants caused two outside engineering firms to review and "rebuild" the model; and

(e) Defendants failed to disclose that, as a result of the overstatement of gold ore reserves, the Company's gold production in 2011 was unsustainable and Nevsun's 2012 and 2013 cash flows were materially negatively affected. Bisha's gold production was ultimately revised downward, to 280,000 to 300,000 ounces for 2012, a decline of between 79,000 to 99,000 ounces (32% to 37%) from the Bisha Mine's 2011 production level of 379,000 ounces, representing a loss of between approximately $126 to $158 million in sales and cash flows in 2012 (at $1,599 per ounce).

(<u>Id</u>. ¶ 106)

## I.    FACTUAL BACKGROUND[1]

In December 2007, Nevsun entered into an agreement with the Eritrean National Mining Company ("ENAMCO") in which ENAMCO took a 10% stake in the mine and agreed to purchase an additional 30% interest at market value, once Bisha made its first gold shipment. (<u>Id.</u> ¶ 64)

On January 4, 2011, Nevsun issued a press release announcing the "successful first gold pour" at the Bisha Mine, and the first gold shipment from Bisha took place on January 28, 2011. (<u>Id.</u> ¶¶ 66-67) This shipment triggered a 90-day valuation period for ENAMCO's 30% stake. (<u>Id.</u> ¶ 67)

---

[1] The Court's statement of facts is drawn from the Complaint's factual allegations, which are presumed to be true for purpose of this motion. In deciding a motion to dismiss, a Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Accordingly, in connection with this motion, the Court has considered the exhibits attached to the Levin Declaration, which fall within this rule.

Nevsun began commercial production of gold at the Bisha Mine on February 22, 2011. (Id. ¶ 68)  Bisha has three mining zones:  the top or "Oxide" zone, which contains gold ore; the middle or "Supergene" zone, which contains copper; and the lowest or "Primary" zone, which primarily contains zinc.  (Id. ¶ 5)  After beginning commercial production of gold on February 22, 2011, the Complaint alleges that Defendants quickly learned that the Oxide Zone – where the gold ore was located – contained a much high percentage of waste rock, and a lower percentage of gold ore, than had been anticipated and reported.  (Id. ¶¶ 9, 73)  This discovery meant that Bisha's gold ore reserves would be exhausted sooner than had been reported, negatively affecting Nevsun's cash flow and valuation.  (Id. ¶ 74)

On March 28, 2011, Defendants issued a press release stating that Bisha Mine had gold ore reserves of 4.651 million tons and that there were 919,000 ounces of gold in the Oxide zone of the mine.  (Id. ¶ 107)  Defendants further represented that Bisha's 2011 Strip Ratio – the ratio of waste rock mined compared to valuable gold ore – was 2.71, and that Defendants planned a reserve "restatement" by the end of 2011 that would reflect further increased gold reserves.  (Id. ¶¶ 7, 111)  The Complaint alleges that the Strip Ratio is an important metric for investors and affects the value of a mining company's stock, because it reflects the time and expense necessary to mine a certain amount of gold.  (Id. ¶¶ 7, 57)  "A material increase in Strip Ratio was a red flag because it indicates an increase in expenses, including increased costs and expenses for labor, water and diesel fuel, and importantly, exhaustion of the Oxide zone sooner than reported."  (Id. ¶ 57)

Plaintiffs allege that the March 28, 2011 press release contains several materially false statements.  Plaintiffs claim that Bisha's gold ore reserves in the Oxide zone were overstated by approximately 1.2-1.3 million tons, or by 35%, and that the ounces of gold in

Bisha's Oxide zone were overstated by approximately 190,000 to 230,000 ounces.  (Id. ¶ 108)

Plaintiffs further represent that, as of late March 2011, Bisha's strip ratio was actually 4.9,

approximately 81% higher than the Strip Ratio reported in Defendants' press release.  (Id. ¶ 72)

On April 1, 2011, Nevsun filed its 2010 Annual Report with the SEC.  The

Annual Report represented that Bisha's gold ore reserves were 28.3 million tons, that the mine

held 919,000 ounces of gold in the Oxide zone, and "that Bisha's life time Strip Ratio was 4.2."

(Id. ¶ 113)  Plaintiffs claim that all of these statements were false, for the reasons stated above.

(Id. ¶ 114)

On April 6, 2011, Defendants issued a press release discussing operating

highlights for the quarter ending March 31, 2011.  (Id. ¶ 117)  The press release states that "[t]he

Bisha mine continues to perform very well and is now producing over 1,000 oz gold per day."

(Id.)  On April 14, 2011, Defendant Trebilcock made a presentation at the Denver Gold Group

European Gold Forum in Switzerland in which he stated that Nevsun had increased its estimate

of gold reserves at Bisha "from 20 to 28 million tonnes," and that Nevsun's "plan is to bring the

total reserve table up to 40 million tonnes by the end of the year."  (Id. 119)  Plaintiffs claim that

Trebilock's statements were false and misleading because Bisha's gold reserves were not

increasing, and in fact were overstated.  (Id. ¶¶ 108, 110, 120)

On May 11, 2011, Nevsun announced its results for the first quarter of 2011.

Nevsun reported that the strip ratio for the three-month period ending March 31, 2011 was 4.9,

which was "in line with expectations."  (Levin Decl., Ex. I (5/11/11 6-K) Management

Discussion and Analysis ("MD&A"), at 3)  By June 30, 2013, however, the Strip Ratio had

increased to 5.1,[2] but Defendants did not disclose the increase to investors.  (Cmplt. ¶ 77)  Indeed, when asked about the strip ratio during an August 11, 2011 conference call with investors, Defendant Davis falsely represented that Bisha was stripping 20,000 tons of rock per day, indicating that the strip ratio was unchanged at 4.9.  (Id. ¶ 137)  Plaintiffs allege that Bisha was actually stripping 23,000 tons of rock per day – approximately 15% more than Davis represented – and that when compared with the amount of gold ore that was mined per day, correlates to a strip ratio of 5.1.  (Id.)  Throughout the fall of 2011, Defendants represented to investors that Bisha "continues to perform very well" and "in excess of plan," despite knowing that conditions at the mine had deteriorated, as reflected in a steadily increasing strip ratio.  (Id. ¶¶ 109-110, 112, 117, 130, 139, 158)

The Complaint further alleges that Defendants were aware of the true nature of the gold reserves and the true strip ratios because they received real-time information concerning "the Bisha Mine's mining statistics and production records" through use of specialized computer software.  (Id. ¶¶ 58-63, 75)  Plaintiffs further allege that the negative trend in strip ratio would have been obvious to Defendants "based on routine reconciliations of actual production to the reported reserves and through the day to day observation of production."  (Id. ¶ 75)  In addition, the mine's on-site General Manager – Stanley C. Rogers – reported directly to Defendants.  (Id. ¶ 53)

Plaintiffs allege that Defendants' material misstatements and omissions about the Bisha Mine's gold reserves and the ever-increasing strip ratio were motivated in part by their then ongoing negotiations with ENAMCO to sell it a 30% stake in the mine.  The amount of gold

---

[2]  Defendants dispute that the strip ratio in June 30, 2011 was 5.1, arguing that Plaintiff's math is wrong.  (Def. Br. 15 n.17)  However, Defendants disclosed the 5.1 number in their August 8, 2012 6-K.  (See Levin Decl., Ex. Z at MD&A – 2012 Second Quarter, at 5)

6

reserves and the strip ratio would affect the purchase price. (Id. ¶¶ 4, 78-80) In August 2011, Defendants and ENAMCO agreed to a purchase price of $253 million for ENAMCO's 30% stake, resulting in a personal gain to Defendants Davis, Hardie, and Trebilcock, because their compensation was affected by the sale. (Id. ¶¶ 78-80, 177-179; Levin Decl., Ex. Y (May 2012 Form 6-K), at 5-6) By September 2011, Defendants' transaction with ENAMCO had caused Nevsun's stock price to reach Class Period-highs. (Id. ¶ 82)

While the stock was trading at record highs, the negative trend in the Strip Ratio and in the amount of gold reserves continued, and no disclosure of this trend was made to investors. For example, Defendants knew that the true Strip Ratio for the second half of 2011 was 6.6, but did not disclose that to investors. (Id. ¶ 160) Meanwhile, Defendants Davis and Hardie sold their holdings in Nevsun's common stock. On September 2 and 6, 2011, Hardie sold all of his 180,000 shares of Nevsun common stock for approximately $1.3 million. (Id. ¶ 82) On September 18, 2011, Davis sold 224,600 shares for $1.5 million. (Id. ¶ 83)

In late 2011, Defendants hired AGP Mining Consultants ("AGP") and another engineering firm to "rebuild Bisha's Oxide reserve model." (Id. ¶ 86) Plaintiffs argue that this step – which was not disclosed to investors – demonstrates that Defendant knew that their current model for determining Bisha's gold ore reserves was not reliable. (Id. ¶¶ 86, 144) By November 2011, the three senior executives on-site at the Bisha Mine – Rogers, Vickers, and Pretorius – had all left the Company. Their departure was likewise not publicly disclosed. (Id. ¶¶ 11, 84-85)

On January 10, 2012, Nevsun issued a press release stating that "[t]he Bisha Mine continued to operate in excess of plan for gold recovery and maintained planned milling and gold production rates in Q4." (Id. ¶ 90) Defendant Davis "congratulate[d] the Bisha team for a strong

performance." (Id.) The press release did not disclose the overstatement of the gold reserves, the steady increase in Strip Ratio, Defendants' decision to hire two engineering firms to rebuild the Company's model for determining gold ore reserves at the Bisha Mine, or that Bisha's entire on-site senior management team had left the Company. (Id. ¶ 91)

Less than a month later, on February 7, 2012, Defendants disclosed to investors that Nevsun's gold ore reserves in the Oxide zone had been overstated by 35%; that the amount of gold that Bisha would produce in 2012 would be about half of what Nevsun had previously represented to investors; and that they had hired engineers to rebuild their gold ore reserve model. (Id. ¶¶ 14, 92-93) On a conference call with analysts that day, Davis offered this explanation for the overstatement: "we were progressing through the [Oxide zone] much more quickly" and "there were significant pockets that we would have hoped had been grade and [gold] ore previously that we ended up sending to the waste pile." (Id. ¶ 95) An analyst on the call asked Davis whether what he was "saying is [that] the strip ratio was basically a lot higher in 2011 than you thought?" Davis answered, "Exactly." (Id.)

The overstatement of gold reserves represents a loss of sales and cash flows of approximately $126 to $158 million for 2012 and 2013. (Id. ¶ 106(e)) By the next day – February 8, 2012 – Nevsun's stock had fallen 31%. (Id. ¶ 14)

## II.    PROCEDURAL HISTORY

On March 13, 2012, the first of two putative securities fraud class action lawsuits was filed on behalf of investors in Nevsun common stock during the Class Period. (Dkt. No. 1) On June 28, 2012, this Court consolidated the two actions and appointed Lead Plaintiff and Lead Counsel. (Dkt. No. 16) The Consolidated Class Action Complaint was filed on August 12,

8

2012.  (Dkt. No. 18)  Defendants filed their motion to dismiss on November 7, 2012.  (Dkt. No. 19)

**DISCUSSION**

**I.      LEGAL STANDARD**

     **A.      Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . .  the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  Port Dock & Stone Corp. v. Oldcastle NE., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir.

9

1999)).  Moreover, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  DiFolco, 622 F.3d at 111 (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).  A court may also consider "legally required public disclosure documents filed with the SEC."  ATSI Commc'ns, Inc, 493 F.3d at 98.

B.      Securities Fraud

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards."  In re Gen. Elec. Co. Sec. Litig., 857 F.Supp.2d 367, 383 (S.D.N.Y. 2010).  First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud . . . shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).

The heightened pleading requirement under Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."  ATSI Communications, Inc., 493 F.3d at 99.  Thus, a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Moreover, under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §

78u-4(b)(2); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud."). "To qualify as 'strong' within the intendment of [the PLSRA], . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PLSRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

I. **THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION 10(B) OF THE EXCHANGE ACT**

Defendants contend that Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 must be dismissed because "none of Defendants' alleged misstatements or omissions is actionable as a matter of law." (Def. Br. 8)  Defendants argue that the alleged misrepresentations and omissions concerning Bisha's gold reserves, Strip Ratio, and expected gold production for 2012 are non-actionable "forward-looking statements" and are protected by the "bespeaks caution" doctrine. (Def. Br. 9 & n.11)  Defendants further argue that statements that Bisha "continues to perform well" and is operating "in excess of plan" are non-actionable statements of corporate optimism or puffery.  (Id. at 11-12)  With respect to alleged omissions, Defendants assert that they had no duty to disclose that Vickers, Pretorius, and Rogers had left the company, or that there were "negative trends" at the mine.  (Id. at 13-16)  Finally,

11

Defendants argue that they did not "make" certain statements pursuant to <u>Janus Capital Group.,</u> <u>Inc. v. First Derivative Traders</u>, 131 S. Ct. 2296 (2011).  (<u>Id.</u> at 16)

### A.   <u>Statutory Framework</u>

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in violation of the rules set forth by the Securities and Exchange Commission ("SEC") for the protection of investors. 15 U.S.C. § 78j. Pursuant to SEC Rule 10b-5, promulgated thereunder, it is unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To sustain a private cause of action for securities fraud under Section 10(b) and Rule 10b-5

a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

<u>Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.</u>, 552 U.S. 148, 157 (2008) (citing <u>Dura</u> <u>Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005)).

B.       **The Complaint Adequatel Alleges Actionable Misstatements or Omissions**

1.       **The PSLRA Safe Harbor for Forward-Looking Statements**

a.       **Applicable Law**

"The PSLRA established a statutory safe-harbor for forward-looking statements."

Slayton v. Am. Exp. Co., 604 F.3d 758, 765 (2d Cir. 2010).  Under the PSLRA, where a

> private action . . . is based on an untrue statement of a material fact or omission of
> a material fact necessary to make the statement not misleading, [a defendant] shall
> not be liable with respect to any forward-looking statement . . . if and to the extent
> that –
>
> (A) the forward-looking statement is –
>
> (i) identified as a forward-looking statement, and is accompanied by
> meaningful cautionary statements identifying important factors that could
> cause actual results to differ materially from those in the forward-looking
> statement; or
>
> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement – . . .
>
> (ii) if made by a business entity; was –
>
> (I) made by or with the approval of an executive officer of that
> entity; and
>
> (II) made or approved by such officer with actual knowledge by
> that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).

"The safe harbor is written in the disjunctive; that is, a defendant is not liable if

the forward-looking statement is identified and accompanied by meaningful cautionary language

or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was

false or misleading."  Slayton, 604 F.3d at 766.

13

####    b.    Analysis

Defendants argue that the statements Plaintiffs cite in Defendants' March 28, 2011 press release are "forward-looking statements" and are accompanied by "meaningful cautionary language." (Def. Br. 9) For example, Defendants' 2010 Form 40-F warns that the Company's reserve figures are "estimates," "inherently uncertain," and are a "prediction of what mineralization might be found to be present." (Levin Decl., Ex. E (2010 40-F) at 3; Annual Information Form ("AIF") at III, 6, 9; MD&A, at 8-9) The Form 40-F also states that there could be a "material downward or upward revision" of the reserve estimates. (Id., AIF at 6, MD&A at 8)

Forward-looking statements include only those which "speak predictively about the future, such as . . . a statement of the plans and objectives of management for future operations." Gissin v. Endres, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) Here, the Complaint's factual allegations – which this Court must accept as true for purposes of Defendants' motion to dismiss – include that Defendants knew at the time they issued the March 28, 2011 press release that the gold reserves were overstated and that the Strip Ratio was much less favorable than was represented. (Cmplt. ¶ 76) The Complaint further alleges that Defendants knew that their representations were false because they had access to real-time mining statistics, and production reconciliation reports, demonstrating that the Strip Ratio was much higher than represented in the press release, and that mining through the Oxide zone was proceeding much faster than reported. (Id. ¶¶ 74-77). Because the statements cited by Plaintiffs are representations of present fact, they do not fall within the PSLRA's safe harbor for forward-looking statements. See Rombach, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); see also In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003). ("'[I]t is well recognized that even when an allegedly false

14

statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply.'" (quoting In re APAC Teleservice, Inc. Sec. Litig., No. 97 Civ. 9145, 1999 WL 1052004, at *7 (S.D.N.Y. Nov. 19, 1999))).[3]

### 2.     Representations that are "Puffery"

Defendants argue that certain statements Plaintiffs rely on – including that Bisha "continues to perform well," "in excess of plan," "ha[s] an impeccable record," and is "well positioned" – are non-actionable statements of corporate optimism or puffery or non-actionable opinion.  (Def. Br. 11-12 (citing Cmplt. ¶¶ 109, 117, 130, 139, 148, 156, 158-59))

Statements of "puffery" are not actionable as securities fraud because investors do not rely on "generalizations regarding integrity, fiscal discipline and risk management."  In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) (citing Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (statements that a company refused to "compromise its financial integrity," that it had a "commitment to create earnings opportunities" and that these "business strategies [would] lead to continued prosperity" constituted "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable")). "Similarly, statements of 'corporate optimism' do not give rise to securities violations because

---

[3]  In a footnote, Defendants contend that their statements concerning gold reserves are protected by the "bespeaks caution" doctrine, under which alleged misrepresentations are immaterial and therefore not actionable if "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language."  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).  (Def. Br. 9 n.11)  The doctrine does not apply, however, where, as alleged here, "a defendant knew that its statement was false when made."  Gabriel Capital, L.P. v. NatWest Fin., Inc., 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000); see also Milman v. Box Hill Systems Corp., 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made.").

'companies must be permitted to operate with a hopeful outlook.'" In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 272 n.35 (S.D.N.Y. 2010) (quoting Rombach, 355 F.3d at 174).

Similarly, statements of opinion are generally not-actionable. See Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011) (holding that under Sections 11 and 12 of the Securities Act of 1933, "liability [for opinions] lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed."); City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67 (2d Cir. 2012) (extending Fait to claims under Section 10(b)).

Here, when examined in context, the statements that Defendants challenge as puffery or expressions of opinion are in fact non-actionable. Moreover, none of these statements address Bisha's gold reserves, strip ratio, or life of mine – the areas in which Plaintiffs allege Defendants made misrepresentations:

- On October 6, 2011, Defendants issued a press release stating that "[t]he Bisha Mine continues to operate in excess of plan for mill gold recovery" and that Bisha had an "impeccable track record." (Cmplt. ¶ 139 (emphasis added))

- On November 14, 2011, during a conference call with investors, Davis stated:

  > I am going to go through a lot of numbers that truly demonstrate what a great operation the Bisha Mine really is. We produced 110,000 ounces of gold in Q3 compared to 93,000 in Q2 and 75,000 in Q1. Our total year-to-date production for 2011 is 278,000 ounces to September 30. We continue to produce at a rate of over 1000 ounces of gold per day, and during October we broke through the 300,000 accumulative ounces produced. Things are going very well, indeed.

  (Id. ¶ 148 (emphasis added))

- On November 21, 2011, Nevsun issued a press release, which quoted Davis as stating: "Nevsun is well positioned to fund growth and provide a dividend return to our shareholders . . . Today's increased dividend further differentiates Nevsun from its peer group and demonstrates our confidence in future cash flow." (Id. ¶ 156 (emphasis added))

16

- On January 10, 2012, Nevsun issued a press release which quoted Davis as stating "2011 was a very successful year. . . . I would like to congratulate the Bisha team for a strong performance, producing 379,000 ounces of gold in the first year of operations at Bisha. We look forward to 2012. . . ." (Id. ¶ 159 (emphasis added))

Plaintiffs do not contend that Defendants made misleading statements about actual gold production at Bisha in 2011. Accordingly, to the extent that the above statements address that issue, they do not provide a basis for liability. Moreover, courts have generally not found actionable statements such as "things are going very well," a company is "well positioned," or operations are "successful," unless the statements addressed concrete and measurable areas of the defendant company's performance. For example, in Ambac Financial Group, Inc. Securities Litigation, Defendants reported that "Ambac's CDO portfolio was currently outperforming the market and relevant indices." 693 F. Supp. 2d at 272. The court held that this statement was not "puffery" or "corporate optimism" because it "convey[ed] something concrete and measurable about Ambac's financial situation, and a reasonable investor could certainly find [such a statement] important to the 'total mix' of information available." Id.

Likewise, in Novak v. Kasaks, the Second Circuit held that certain statements were not puffery because they were specifically tied to alleged false and misleading statements about retail chain AnnTaylor's inventory. 216 F.3d 300, 315 (2d Cir. 2000). In that case, Plaintiffs alleged that Defendants made materially false and misleading statements about AnnTaylor's financial performance. Id. at 303. Plaintiffs complained in particular about AnnTaylor's "so-called 'Box and Hold' practice, whereby a substantial and growing quantity of out-of-date inventory was stored in several warehouses during the Class Period without being marked down." Id. at 304. AnnTaylor did not distinguish "Box and Hold" inventory from new inventory, or write-off any of the "Box and Hold" inventory. Instead, the defendants described AnnTaylor's inventory as "'under control,' 'in good shape,' and at 'reasonable' or 'expected'

17

levels; stating that 'no major or unusual markdowns were anticipated'; and attributing rising levels of inventory to growth, expansion, and planned future sales." Id.

The Second Circuit held that these statements were not "puffery" or "corporate optimism," noting that the Complaint alleged that the defendants made these statements "while they allegedly knew that the contrary was true. Assuming, as we must at this stage, the accuracy of the plaintiffs' allegations about AnnTaylor's "Box and Hold" practices, these statements were plainly false and misleading." Id. at 315.

Here, by contrast, Defendants' optimistic statements do not address the subjects about which Plaintiffs claim Defendants made false and misleading statements:  Bisha's gold reserves, strip ratio, and life of mine.  Statements addressing matters about which Plaintiffs have not claimed that Defendants made misleading statements – such as Bisha's actual gold production in 2011 – or statements expressing a general view that "things are going well," that the company is "well positioned," or that a year was "successful" are generally not actionable. See Lasker 85 F.3d 55 at 59 (general statements such as touting the company's "commitment to create earnings opportunities" and that certain "business strategies [would] lead to continued prosperity" constituted "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable")).  Moreover, statements that "things are going very well," that Bisha had an "impeccable track record," that Nevsun was "well positioned," and that "2011 was a very successful year" are – in the context in which they were said here – non-actionable statements of opinion.

Accordingly, Plaintiffs cannot base their Section 10(b) claim on these statements.

### 3.    Plaintiffs have Pled Materially False Statements or Omissions about the Bisha Mine's Operations

The Court concludes that Plaintiffs have adequately pled materially false statements relating to the Bisha Mine's strip ratio, gold reserves, and life of mine.  Plantiffs have pled facts demonstrating that strip ratio is a critical metric for analysts and investors, and that strip ratio has important implications for calculating reserves and life of mine.  They have also pleaded facts demonstrating that Defendants repeatedly issued statements that represented Bisha's strip ratio to be lower than they then knew it to be.  See Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002) ("upon choosing to speak, one must speak truthfully . . . [and] accurate[ly]"); In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 387 (S.D.N.Y. 2012) ("once a company chooses to speak . . . 'it has a duty to disclose any additional material fact 'necessary to make the statements [already contained therein] not misleading'") (quoting In re CitiGroup Inc. Bond Litig., 723 F. Supp. 2d 568, 590 (S.D.N.Y.2010)); In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) (noting that under Section 10(b), "a duty may arise as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts").

As to Defendants' failure to disclose the departure of its entire on-site management team at Bisha, or its retention of two engineering firms to re-build the reserves model on which prior estimates of gold reserves disseminated to investors had been based, the Court cannot say at this stage of the proceedings that such information would not have been material to investors.  See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) ("'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the

19

question of their importance.'" (quoting <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 162 (2d Cir. 2000)).[4]

### 4.    Statements Purportedly "Made" by <u>AMEC are Attributable to Defendants</u>

Defendants' March 28, 2011 press release sets forth Bisha Mine gold ore reserve figures, estimates of gold that will be recovered from the Bisha Mine's Oxide zone, and a life of mine estimate of 13 years.  These figures are based on a report prepared by AMEC Americas Limited ("AMEC"), an independent engineering firm.  (<u>See</u> Levin Decl., Ex. C (Mar. 30, 2011 Form 6-K) at 1-1, 1-10, and 2-1)

Relying on <u>Janus Capital Group., Inc. v. First Derivative Traders</u>, 131 S. Ct. 2296 (2011), Defendants argue that AMEC, and not Defendants, was the "maker" of the alleged false and misleading statements concerning Bisha's gold ore reserves, ultimate expected gold production, and life of mine.  (Def. Br. 16-17)

In <u>Janus</u>, the shareholders of parent company Janus Capital Group ("JCG") sued wholly-owned subsidiary Janus Capital Management ("JCM"), a mutual fund investment

---

[4]  The Complaint also alleges that Defendants violated Item 303 of SEC Regulation S-K in failing to disclose the negative trends at the Bisha Mine. (Cmplt. ¶ 194)  Defendants argue that Plaintiffs cannot base their Section 10(b) claim on a violation of Item 303, which requires a company in certain circumstances to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii). (Def. Br. 13)  This Court agrees.  In the Second Circuit, "[i]t is far from certain that the requirement that there be a duty to disclose under Rule 10b-5 may be satisfied by importing the disclosure duties from S-K 303."  <u>In re Canandaigua Sec. Litig.</u>, 944 F. Supp. 1202, 1209 n.4 (S.D.N.Y. 1996); <u>see also</u> <u>In re Quintel Entm't Inc. Sec. Litig.</u>, 72 F. Supp. 2d 283, 293 (S.D.N.Y. 1999) ("In light of the absence of authority for the position that a failure to comply with the disclosure duties under Item 303 can be the basis of a § 10(b) action, this Court refuses so to hold."); <u>accord</u> <u>Oran v. Stafford</u>, 226 F.3d 275, 288 (3d Cir. 2000) (Alito, J.) ("[A] violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5.").  Accordingly, Plaintiffs cannot base their Section 10(b) claim on a theory that Defendants violated Item 303.

advisor, alleging that JCM had made misstatements in fund prospectuses in violation of Rule 10b-5. The prospectuses were filed with the SEC by the Janus Investment Fund, a separate legal entity owned by mutual fund investors that had no assets apart from those owned by fund investors. The Investment Fund had the same officers as JCM, but had an independent board of trustees.

The question for the Court was whether JCM had "made" the allegedly misleading statements in the prospectuses under Rule 10b-5, given its role as investment advisor to the fund. The Supreme Court held that JCM was not liable under Rule 10b-5, because a defendant only "makes" a statement for purposes of a private Rule 10b-5 action if the defendant "is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus, 131 S. Ct. at 2302. "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed." Id.

Here, although Defendants purported to rely on AMEC's report for certain of their statements, the Complaint alleges that Defendants adopted those statements, filed them with the SEC, and thereafter repeated them to investors. (See Cmplt. ¶¶ 107, 109, 117, 119, 130, 139, 158) That is sufficient for the Court to find that Defendants "made" the statements under Janus. See Janus, 131 S. Ct. at 2302 ("Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit – or blame – for what is ultimately said.").[5]

---

[5] Trebilcock argues in a footnote that Plaintiffs have not alleged facts showing that he "made" the challenged statements in Nevsun's press releases and securities filings, given that he did not sign these materials. Trebilcock further argues that if he "made" the statements during investor presentations, he was merely repeating statements from the filings. (Def. Br. 17 n.20)

C.      **The Complaint Adequately Pleads Facts
        <u>Giving Rise to a Strong Inference of Scienter</u>**

Defendants argue that "Plaintiffs utterly fail to allege scienter against any Defendant, and therefore fall far short of the stringent pleading requirements of the PSLRA." (Def. Br. 17)

1.      <u>Applicable Law</u>

Rule 9(b) reflects a "relaxation" of the specificity requirement in pleading the scienter element of fraud claims, requiring that fraudulent intent need only be "alleged generally." <u>See</u> <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994); Fed. R. Civ. P. 9(b). The Second Circuit has made clear, however, that this "relaxation . . . 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" <u>Shields</u>, 25 F.3d at 1128 (quoting <u>O'Brien v. Nat'l Prop. Analysts Partners</u>, 396 F.2d 674, 676 (2d Cir. 1991)). Accordingly, the Second Circuit has long required plaintiffs making securities fraud claims to "allege facts that give rise to a strong inference of fraudulent intent." <u>Novak v. Kasaks</u>, 216 F.3d 300, 307 (2d Cir. 2000); <u>see</u> <u>also</u> <u>Shields</u>, 25 F.3d at 1128.

---

Plaintiffs rely on the "group pleading" doctrine, "which allows a plaintiff to rely on a presumption that written statements that are 'group-published,' <u>e.g.</u>, SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'" <u>City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.</u>, 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (quoting <u>Camofi Master LDC v. Riptide Worldwide, Inc.</u>, No. 10 Civ. 4020 (CM), 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011)). "[M]ost judges in this District have continued to conclude that group pleading is alive and well [after <u>Janus</u>]." <u>Id.</u> at 374.

Under the group pleading doctrine, Trebilcock – and Davis and Hardie, the other senior executives named in the Complaint – "made" the statements in Nevsun's press releases and securities filings. As for the statements Trebilcock made to investors during investor conference calls, "[i]n the post-<u>Janus</u> world, an executive may be held accountable . . . where the statement is attributed to the executive." <u>In re Fannie Mae 2008 Sec. Litig.</u>, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012). In sum, Plaintiffs have adequately alleges that Trebilcock "made" the statements at issue.

The PSLRA adopts the "strong inference" standard set by the Second Circuit, and provides that "where proof of scienter is a required element . . . a complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010) (quoting 15 U.S.C. § 78u-4(b)(2)). "Under this heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Slayton, 604 F.3d at 766 (quoting Tellabs, 551 U.S. at 324). "In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be 'taken collectively.'" Id.

"The 'strong inference' standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered." Id. "The plaintiff may satisfy [the PSLRA's heightened pleading] requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc., 493 F.3d at 99 (citing Ganino, 228 F.3d at 168-69).

### 2.   Analysis

#### a.   The Complaint Adequately Alleges that Defendants Had Motive and Opportunity to Commit Fraud

Defendants do not argue that they had no opportunity to commit fraud. Instead, they contend that Plaintiffs have not alleged facts demonstrating motive – i.e., "'concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged.'" (Def. Br. 18 (quoting Kalnit, 264 F.3d at 139)) The Court concludes that Plaintiffs

23

have pled sufficient facts to demonstrate that Defendants had both the motive and the opportunity to commit fraud under the heightened standard set by the PSLRA.

The Complaint alleges that Davis, Hardie, and Trebilcock "derived concrete and personal benefits from the fraud, including massive cash bonuses and sales of Nevsun stock at inflated prices." (Cmplt. ¶ 176) The Complaint further alleges that these Defendants were motivated to overstate the gold reserves at Bisha in order to extract a high price from ENAMCO for the 30% stake it was purchasing in the mine. (Id. ¶ 177)

With respect to bonuses and sales of stock, the Complaint alleges that in September 2011 – when Nevsun stock was trading at record highs – Davis sold 224,600 common shares of Nevsun stock for $1.5 million. Davis also received $1.14 million in 2011 compensation, including a $600,000 cash bonus. (Id. ¶ 29) In early September, Hardie likewise sold 180,000 shares – his entire Nevsun stock holdings – for $1.3 million. His 2011 compensation was $889,816 including a cash bonus of $125,000. (Id. ¶ 33) Trebilcock earned $556,939 in 2011, including a cash bonus of $150,000.[6] (Id. ¶ 35)

Nevsun's board approved bonuses for the Individual Defendants in December 2011. (Levin Decl., Ex. Y (May 2012 Form 6-K), at 7-8 n.4) Their compensation and bonuses were linked to the success of the Bisha Mine, and to the transaction with ENAMCO. (Id. at 5 (the "compensation program" for these Defendants "is designed to reward contributions to" inter

---

[6] Rogers – a "Named Executive Officer" in Nevsun's May 2012 Form 6-K – also sold 100% of his Nevsun stock in November and December 2011. (Cmplt. ¶ 12) Defendants argue that Rogers' sale was not suspicious because "it is commonplace, not 'suspicious' or 'unusual' for individuals who depart a company to sell their stock in that company." (Def. Br. 21) While that may be true in some cases – see In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865 (HB), 1998 WL 283286, at *6 n.4 (S.D.N.Y. June 1, 1998) ("While defendant McIntyre's sales were quite high during the Class Period, this was most likely on account of the fact that he resigned as an HMS director prior to January 1997 and was divesting himself of his shares.") – the Court cannot speculate about Rogers' reasons for selling his shares at this stage of the proceedings.

alia, Bisha's "successful operations [and] expansion of existing assets")) Furthermore, Davis's compensation was based, in part, on "managing Eritrea Government relations and strategic arrangements" and "achieving successful negotiations in Company transactions." (Id.)

Plaintiffs plausibly allege that the timing and magnitude of Defendants' stock sales support a strong inference of scienter. Defendants' stock sales took place shortly after the transaction with ENAMCO and shortly before (1) Defendants' retention of two engineering firms to re-build their reserve model, and (2) the departure of Bisha Mine's three top on-site executives.[7] See Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) (holding that plaintiff had adequately alleged motive where "during the period of the misrepresentations . . . insiders unloaded large positions in Alias"); In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (finding motive sufficiently alleged against one defendant "who dumped nearly all of his shares during the Class Period").

Moreover, Plaintiffs' allegation that Defendants were motivated to overstate the gold reserves in order to increase the price paid by ENAMCO for its 30% stake in the mine is sufficient to survive a motion to dismiss. See Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000) ("[T]he artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."); Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 455 (S.D.N.Y. 2007) ("[A] business seeking to . . . induce a beneficial sale has sufficient motive to commit fraud to raise the requisite 'strong inference' of fraud under Rule 9(b)."); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (allegation that defendants "sought to

---

[7] Defendants argue that Davis also purchased Nevsun shares during the Class Period. (Def. Br. 18; see Levin Decl., Ex. BB, at 6, 9) However, the shares Davis purchased were acquired through the exercise of stock appreciation rights and options that were granted to Davis as part of his compensation. He did not buy any shares on the open market.

25

maintain the artificially high stock price so that [the company] might use that stock as currency for acquisitions . . . is a sufficiently concrete motive to support a strong inference of scienter").

### b.     The Complaint Adequately Alleges Conscious Misbehavior or Recklessness

Rule 9(b)'s scienter requirement is also satisfied where a complaint contains factual allegations "'that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Kalnit, 264 F.3d at 138 (quoting Acito v. Imcera Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995)). Plaintiffs proceeding under the "conscious misbehavior or recklessness" theory must allege reckless conduct that is "at the least . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit, 264 F.3d at 142 (quoting Honeyman v. Hoyt, 220 F.3d 36, 39 (2d Cir. 2000)).

While this is a "highly fact-based inquiry," securities fraud claims "typically" survive motions to dismiss where a plaintiff has "'specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" Kalnit, 264 F.3d at 142 (quoting Novak, 216 F.3d at 308). A failure "to check information [defendants'] had a duty to monitor" may also give rise to a strong inference of recklessness. Novak, 216 F.3d at 311; see also Nathel v. Siegal, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008). Under such circumstances, "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Kalnit, 264 F.3d at 142.

Where, as here, "information contrary to the alleged misrepresentations is alleged to have been known by defendants at the time the misrepresentations were made, the falsity and scienter requirements are essentially combined." In re Revlon, Inc. Sec. Litig., No. 99 Civ.

26

10192 (SHS), 2001 WL 293820, at *7 (S.D.N.Y. March 27, 2001) (citing <u>Rothman</u>, 220 F.3d att 89-90).

As discussed above, Plaintiffs have adequately pled that Defendants "knew or, more importantly, should have known that they were misrepresenting material facts" concerning Bisha Mine's strip ratio, gold reserves, and life of mine.  <u>See</u> <u>Kalnit</u>, 264 F.3d at 142 (citations omitted).  Accordingly, Plaintiffs have alleged "strong circumstantial evidence of conscious misbehavior or recklessness."  <u>Id.</u> at 138 (citations omitted).

Defendants' motion to dismiss Plaintiffs' Section 10(b) claim will be denied.

## II.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTION 20(A) OF THE EXCHANGE ACT

Under Section 20(a) of the Exchange Act, a person exercising "control" over a person liable under § 10(b) is also liable, subject only to the defense of "good faith."  15 U.S.C. § 78t(a).  "'In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation.'"  <u>In re Am. Int'l Grp., Inc. 2008 Sec. Litig.</u>, 741 F. Supp. 2d 511, 535 (S.D.N.Y. 2010) (quoting <u>Boguslavsky v. Kaplan</u>, 159 F.3d 715, 720 (2d Cir. 1998)).

Defendants' sole argument for dismissal of this claim is that "Plaintiffs have not properly alleged an underlying primary violation by Nevsun."  (Def. Br. 25)  Given that this Court has concluded that Plaintiffs have adequately alleged a primary violation of Section 10(b), Defendants' motion to dismiss Plaintiffs' Section 20(a) claim will be denied.

## CONCLUSION

Defendants' motion to dismiss is DENIED.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 19).

Dated:  New York, New York
       September 27, 2013

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

28